*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
HOLIFIELD, HOUTZ, and HACKEL
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Justin M. GORTZIG**
Aviation Electronics Technician Third Class (E-4), U.S. Navy
*Appellant*

**No. 202100064**

_____

Decided: 31 August 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Derek D. Butler (arraignment)
John C. Johnson (motions)
Eric A. Catto (motions and trial)

Sentence adjudged 6 November 2020 by a general court-martial convened at Naval Air Station Jacksonville, Florida, consisting of enlisted members. Sentence in the Entry of Judgment: reduction to E-1, forfeiture of $866.00 pay per month for 3 months, and a bad-conduct discharge.

For Appellant:
*Lieutenant Commander Michael W. Wester, JAGC, USN*
*Major Mary Claire Finnen, USMC*

For Appellee:
*Major Kerry E. Friedewald, USMC*
*Lieutenant Commander Jeffrey S. Marden, JAGC, USN*

———————————————

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

———————————————

PER CURIAM:

Appellant was convicted, contrary to his pleas, of four specifications[1] of sexual abuse of a child, in violation of Article 120b, Uniform Code of Military Justice [UCMJ],[2] for sexually abusing a child who had not yet reached the age of 16 by directly touching her breast with his hand, touching her vulva with his finger on two occasions, and causing her hand to touch his penis.

Appellant asserts three assignments of error [AOEs], which we reorder as follows: (1) trial defense counsel [TDC] were ineffective for failing to present the victim's statement to Naval Criminal Investigative Service [NCIS] in which she suggested a text message from Appellant stating "I did" was not an admission; (2) the military judge erred by admitting the complaining witness' text messages to a friend under the excited utterance exception to the rule against hearsay; and (3) Appellant's convictions are factually insufficient. We find no prejudicial error and affirm.

## I. BACKGROUND

Appellant first met Amy[3] when she was eleven years old. Appellant lived with the Kilos, who were family friends of Amy. Amy would often spend the night at the Kilo's Deltona, Florida, home and considered the Kilos family. Appellant, eight years senior to Amy, often babysat Amy and the Kilo children.

———————————————

[1] Appellant was found guilty of four specifications, but the military judge merged two specifications for sentencing.

[2] 10 U.S.C. § 920b (2012).

[3] All names in this opinion, other than those of Appellant, the judges, and appellate counsel, are pseudonyms.

Amy considered Appellant family, as well, but they rarely communicated with each other outside of in-person encounters at the Kilo home.

Appellant enlisted in the Navy in July of 2017. Following boot camp, he visited the Kilos in late October 2017, attending a Halloween event with the Kilo family and Amy, who was then fourteen. The group later returned to the Kilo's home to watch a movie. With numerous adults and children present in the living room, Appellant and Amy lay on a small couch in a "spooning" position, each under a separate blanket.

During the movie, Appellant moved his hand under Amy's blanket, reached under her shirt and bra, and grabbed her breast. He then placed his hand in her shorts, moved her underwear aside, and touched her genital area. Amy was surprised and attempted to remove his hand. She did not call out to anyone in the room.

Later that night, when everyone else had gone to their respective bedrooms, Amy and Appellant remained in the living room. While Amy texted friends, Appellant retrieved a towel, placed it under Amy, and pulled her shorts and underwear to her ankles. He again touched her genital area, stopping after a few minutes.

Amy then fell asleep on the couch, only to awaken with Appellant again behind her, this time with his penis exposed. Appellant shook Amy awake and placed her hand on his penis.

At this point Amy left the living room, ultimately ending up in a bedroom. Within ten minutes of her last contact with Appellant, Amy engaged in a text and voice conversation with an online friend in England named Craig. During this conversation, Amy stated she was terrified and crying because Appellant had just sexually abused her. Although Craig urged her to report the assaults, Amy declined out of fear that no one in the home would believe her.

Amy did not report the incident until eight months later, when her mother asked what was bothering her. Amy subsequently provided statements to local law enforcement and NCIS.

Additional facts necessary to address the AOEs are provided below.

## II. DISCUSSION

### A. The Ineffective Assistance of Counsel Claim Fails for Lack of Prejudice

We review claims of ineffective assistance of counsel de novo.[4] To prevail on such a claim, "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice."[5] Appellant bears the "burden of establishing the truth of factual matters relevant to the claim."[6] "To establish prejudice . . . , [Appellant] must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[7] Only after an appellant has met his burden and has demonstrated both deficiency and prejudice can we find in the appellant's favor on an ineffective assistance of counsel claim.[8] Furthermore, "it is not necessary to decide the issue of deficient performance when it is apparent that the alleged deficiency has not caused prejudice.[9]

### 1. Appellant's "I Did" Text

While Appellant and Amy lay on the couch watching the movie, they exchanged the following texts:

| Amy: | HEY HO! |
| | GUESS WHAT! |
| Appellant: | Yes itch! |
| Amy: | YOU WANNA FIGHT? |

---

[4] *United States v. Cooper*, 80 M.J. 664, 672 (N-M. Ct. Crim. App. 2020).

[5] *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)) (other citation omitted).

[6] *Denedo v. United States*, 66 M.J. 114, 128 (C.A.A.F. 2008).

[7] *United States v. Loving*, 68 M.J. 1, 6-7 (C.A.A.F. 2009) (quoting *Strickland*, 466 U.S. at 694).

[8] *Cooper*, 80 M.J. at 672.

[9] *United States v. Bradley*, 71 M.J. 13, 16 (C.A.A.F. 2012). *See also, Strickland*, 466 U.S. at 697. ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.")

| Appellant: | DEF, JUST GOTTA WAIT TIL EVERYONE GOES TO SLEEP [laughing emoji] |
| Amy: | IMA BEAT YO ASS |
| Appellant: | Try me |
| Amy: | you won't do shut |
| | **shit |
| Appellant: | Try me, I got you all to myself and you're right next to me |
| Amy: | you wont[10] |

Amy later described how she believed this exchange was meant as a joke, but that, in hindsight, "[i]t ended up being a giant mistake to text ["you wont"].[11] Nearly two-and-a-half hours later, after the initial assaults, Appellant sent Amy a final text: "I did."[12]

In December 2019, Amy spoke with Special Agent [SA] Sierra of NCIS. While the telephonic interview was not recorded, SA Sierra documented Amy's statements via handwritten notes. In these notes, SA Sierra wrote "I did" accompanied by two arrows: one pointing from "I did" to "victim cried when read" and one pointing from "I did" to "knew [subject] was going to do something."[13] SA Sierra's subsequent "Results of Re-Interview" reflects this: "In reference to the text message "I did" from [Appellant] on 29OCT17 [Amy] stated she cried when she read it. [Amy] recalled she "knew [Appellant] was going to do something.""[14] Neither trial counsel nor defense counsel questioned SA Sierra on this point during her in-court testimony.

At trial, the only time the "I did" text was specifically addressed was when trial counsel asked Amy where she was when she received it.[15] During closing argument, however, the text was highlighted on four of trial counsel's visual aid slides and portrayed as an admission that, combined with Amy's testimony,

---

[10] Pros. Ex. 5.

[11] App. Ex. XXXIX at 4.

[12] Pros. Ex. 5 at 2.

[13] Declaration of LCDR Michael W. Wester, JAGC, USN, Encl. A at 1 (Aug 17, 2022).

[14] App. Ex. XI at 27.

[15] R. at 428.

satisfied the elements of the charged offenses.[16] In the defense's closing argument, the text was dismissed as simply part of what they argued was meaningless joking between Amy and Appellant.[17] (This was supported by the text's temporal relationship to an arguably joking text Amy sent to Craig.)

On appeal, Appellant claims that SA Sierra's notes show that Amy read the "I did" text not as an admission of a past act, but an indication that Appellant "was going to do something" in the future. Therefore, argues Appellant, trial defense counsel's failure to use Amy's statement to SA Sierra to rebut the government's characterization of the text as an admission was deficient performance.

### 2. Competing Affidavits

In response to an order from this Court, Appellant's two trial defense counsel submitted affidavits rebutting their former client's claim of ineffective assistance.[18] The assistant defense counsel [ADC], who was tasked with cross-examining Amy, was very familiar with SA Sierra's notes. She used them quite effectively to refresh Amy's recollection several times. But she was hesitant to ask Amy directly about her discussion with SA Sierra because the ADC did not know how Amy would answer; Amy had declined to speak with defense counsel before trial. Also, the ADC explains, there was little to gain. Attempting to impeach Amy with the handwritten notes of the NCIS agent would likely only have led to confusion without making the desired points. And leaving her statements unexplained played into the defense team's focus on Amy's implausible, changing story and motive to fabricate.

In his affidavit, Appellant's lead defense counsel describes a similar analysis. Amy had barely touched on the "I did" text during her testimony. Trying to impeach her with her statements to SA Sierra would have provided an opportunity for Amy to explain why she thought Appellant was going to abuse her further. And it would have undercut the defense team's theory that the text was simply part of the preceding, joking texts. Had the text been an admission, Amy likely would have mentioned it in her communications with Craig ninety minutes later. (The ADC made this point in her closing argument.)

---

[16] App. Ex. XLVII at 6, 17-19.

[17] R. at 664.

[18] Affs. of TDC.

Finally, neither of the counsel read SA Sierra's notes in the way Appellant now proposes, i.e., that the past-tense statement "I did" somehow signified an intent to do something to Amy in the future.

We subsequently granted Appellant's motion to attach an additional affidavit—this from his now-released appellate counsel, LCDR Wester.[19] In the affidavit LCDR Wester describes a call he had with Appellant's lead TDC in which they discussed SA Sierra's notes. The TDC, after a long pause, provided no strategic reason for not introducing Amy's statement to SA Sierra, and recommended LCDR Wester contact the ADC. This left LCDR Wester with the impression that the failure to introduce the statement may have been an oversight, and not a strategic decision by TDC.

### 3. Assuming Deficient Performance, We Find No Prejudice

Even were we permitted to weigh the merits of the competing affidavits,[20] we find it unnecessary to do so here. Assuming *arguendo* that Appellant's trial defense counsel were deficient, we find that Appellant has not established prejudice. Appellant needs to show more than a mere possibility that introducing Amy's statement to SA Sierra would have aided his defense. He must demonstrate a reasonable probability—that is, "a "substantial," not just "conceivable," likelihood"—that introducing the statement would have produced a different result in his case.[21] He has not done so here.

Appellant asks us to speculate on top of speculation. For him to prevail, we must first find it reasonably likely that introducing Amy's statement via SA Sierra's notes would have achieved the desired result: showing the text was not an admission of past abuse, but only a harbinger of future action. We find such a conclusion both unreasonable and unlikely. A plain reading of "I did"—clearly past-tense—makes Appellant's interpretation illogical.

Also, based on other statements Amy made, we can be fairly certain of how Amy would have responded had TDC attempted to impeach her with the second-hand statement in SA Sierra's notes. In her interview with a Child Protective Team interviewer, Amy estimated that the second sexual abuse event occurred around 2300.[22] The "I did" text was sent *nearly two hours later*. Amy also testified during an Article 39(a), UCMJ, hearing that the "I did" text came

---

[19] Aff. of LCDR Wester.

[20] *See United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997).

[21] *United States v. Bradley*, 71 M.J. 13, 16 (C.A.A.F. 2012) (citing *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)).

[22] App. Ex. 38 at 26.

*after* the sexual assault.[23] We expect that, if Amy were confronted with her purported statement to SA Sierra, her response would have reflected this timeline. At best, her statement to SA Sierra may have provided ADC with an additional, albeit questionable, point to claim during closing argument that the text was not an admission. But the government would still have been free to argue effectively that it was an admission. Given the entirety of the evidence in this case, and particularly the texts between Amy and Craig, we are not convinced that admitting the statement presents a substantial likelihood of a different result and find this AOE lacks merit.

## B. The Military Judge Did Not Abuse His Discretion in Admitting the Victim's Text Messages as "Excited Utterances"

We review a military judge's ruling to admit evidence as an excited utterance for an abuse of discretion.[24] "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion."[25] "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable."[26]

 "A statement relating to a startling event or condition, made while the declarant was under the stress of excitement caused by the event or condition," is admissible as an exception to the general prohibition on hearsay.[27] "The implicit premise [of the exception] is that a person who reacts "to a startling event or condition" while "under the stress of excitement caused" thereby will speak truthfully because of a lack of opportunity to fabricate."[28]

"For a statement to qualify as an excited utterance: (1) the statement must be "spontaneous, excited or impulsive rather than the product of reflection and deliberation"; (2) the event prompting the utterance must be "startling"; and

---

[23] R. at 157

[24] *United States v. Henry*, 81 M.J. 91, 95 (C.A.A.F. 2021) (citation omitted).

[25] *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010).

[26] *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

[27] *Henry*, 81 M.J. at 96 (citing M.R.E. 803(2) and *Manual for Courts-Martial, United States*, Analysis of the Military Rules of Evidence app. 22 at A22-63 (2016 ed.)).

[28] *Id*. (quoting *United States v. Jones*, 30 M.J. 127, 129 (C.M.A. 1990)).

(3) the declarant must be "under the stress of excitement caused by the event.""[29]

### 1. *The Texts Amy Sent to Craig*

Amy testified that, after awaking to Appellant placing her hand on his penis, she left the couch and went to the bathroom. A few minutes later she went into one of the bedrooms, where she reached out to her friend in England, Craig. She testified that, when she contacted Craig, she "was scared" and "didn't understand what was happening."[30] She affirmed she felt this way throughout the conversation with Craig and had not had a chance to reflect or think about what had just happened before contacting him.[31]

Her conversation with Craig was of mixed form. It involved both texts and (unrecorded) oral communication on Craig's part, and texts from Amy, who did not want anyone to overhear her side of the conversation. Early in the conversation Amy texted, "I'm deadass terrified" and "I'm hiding in my cousins room crying."[32] She went on to describe how Appellant "forced himself on [her] when he thought [she] was asleep," "put [her] hand on his dick," "touched [her]," and "tried putting his . . . tounge [sic] in [her] mouth."[33] She also explained why she was reluctant to tell anyone in the Kilo home.

Trial counsel sought to admit screen shots of these texts as excited utterances. Appellant's counsel objected, citing, inter alia, a lack of a proper foundation for admitting the texts as excited utterances.

### 2. *The Military Judge's Ruling*

In ruling on the defense's objection, the military judge walked through the three-prong test for admission of an excited utterance. He found that the first prong—that the statement be spontaneous, excited, or impulsive, and not the result of reflection or deliberation—was supported by Amy's testimony that the communication with Craig started less than ten minutes after the last assault, and that she was scared at the time. He then found that the second prong— that the event prompting the utterance must be startling—was met in that

---

[29] *Id.* (quoting *United States v. Arnold*, 25 M.J. 129, 132 (C.M.A. 1987)).

[30] R. at 402.

[31] R. at 403.

[32] Pros. Ex. 4 at 1-2.

[33] *Id.* at 1, 7.

"placing [Appellant's] penis in the victim's hand would qualify as a startling event."[34]

Regarding the third prong, the military judge found that Amy "could still have been under the stress of the excitement caused by the event."[35] Accordingly, the military judge admitted the texts as an excited utterance.

*3. Analysis*

Appellant claims on appeal that the facts that the utterance at issue was in writing (texts), was made over a 40-minute period, and was mostly in response to Craig's questions indicate it was not spontaneous, but was the result of reflection.

In support of his claim, Appellant cites to a Supreme Judicial Court of Massachusetts holding that, regarding text messages, "[b]ecause a writing is more suspect as a spontaneous exclamation than is an oral statement, the circumstances of the writing would have to include indicia of reliability even more persuasive than those required for an oral statement before we could conclude that the writing qualified as a spontaneous exclamation."[36] We find this unpersuasive. At a time when people—particularly young people—regularly communicate via texts as frequently, or even more frequently, as they do orally on their cell phones, we see no reason to treat such communication methods under different standards. We find this especially true where, as in the instant case, the texts are brief and clearly part of a back-and-forth conversation.

Appellant further cites to an Army Court of Criminal Appeals case wherein our sister court found that the declarant's activity and the length of time between an alleged assault and a statement to a friend rendered the statement unspontaneous.[37] We distinguish this case by noting that, unlike here, the military judge did not place his findings of fact or legal analysis on the record. Accordingly, the Army Court afforded the military judge in that case little deference.[38] But, as in Appellant's case, "where the military judge places on the record his analysis and application of the law to the facts, deference is clearly

---

[34] R. at 406.

[35] R. at 407.

[36] *Commonwealth v. Musgrave*, 472 Mass. 170, 177, 33 N.E. 3d 440 (Mass. 2015) (quoting *Commonwealth v. DiMonte*, 427 Mass. 233, 239, 692 N.E.2d 45 (1998)).

[37] *United States v. Johnson*, No. 20180527, 2020 CCA LEXIS 249 (A. Ct. Crim. App. July 23, 2020).

[38] *Id.*, at *5.

warranted."[39] Applying this deference, we are unpersuaded by Appellant's remaining challenges to the military judge's ruling.[40]

We find the judge's findings of fact to be fully supported by the evidence presented. We also find that he applied the correct legal principles in resolving the matter. And we do not find that his application of those principles to the facts was clearly unreasonable. Accordingly, we find this AOE without merit.

## C. Appellant's Convictions are Factually Sufficient

Appellant asserts the evidence is factually insufficient to support his convictions.[41] Specifically, Appellant claims the evidence was insufficient in that Amy's testimony was implausible, inconsistent with her prior statements, and contradicted by two other witnesses. We review such questions de novo.[42]

In evaluating factual sufficiency, we determine "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are . . . convinced of the [appellant's] guilt beyond a reasonable doubt."[43] In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent de-

---

[39] *United States v. Flesher*, 73 M.J. 303, 312 (C.A.A.F. 2014).

[40] Appellant claims that (1) the evening's previous assaults rendered the final one non-startling, and (2) the government's only evidence regarding Amy's condition at the time of the texts was her own testimony. We decline to speculate as to what number of serial assaults would render a further assault an unstartling event. And we have had "no trouble concluding" that a declarant's own statements are sufficient to establish that the declarant was under the stress and excitement of a startling event. *United States v. Dias*, No. 201500177, 2017 CCA LEXIS 583, *6 (N-M. Ct. Crim. App. August 31, 2017) (unpublished).

[41] Although not raised as an AOE, we also reviewed for legal sufficiency. Article 66(d)(1), UCMJ. And, "considering the evidence in the light most favorable to the prosecution," we find "a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[42] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[43] *Turner*, 25 M.J. at 325.

termination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[44] Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict."[45]

Appellant's trial defense counsel did an admirable job in seeking to impeach Amy's testimony. Her testimony was not "free from conflict." On appeal, as at trial, Appellant challenges Amy's description of the initial sexual abuse during the movie as implausible in that it occurred in a room full of people and that she did not cry out in pain or ask for help. But we find Amy's explanation—that she was scared and did not think anyone would believe her—was credible in light of all evidence presented on the merits. We also find credible her descriptions of the subsequent abusive events. Viewed together with the other evidence admitted at trial, we find the various inconsistencies between her in-court testimony and previous statements are insufficient to constitute a reasonable doubt as to Appellant's guilt. And, for reasons evident in the record, we give little weight to the purportedly conflicting testimony of other witnesses.

After weighing the evidence admitted and presented to the members during the trial, and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt and find that the evidence is factually sufficient to support Appellant's convictions.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[46]

However, we note that the Entry of Judgment does not accurately reflect the disposition of the charges. Specifically, the original Entry of Judgment indicates the military judge merged for sentencing purposes specifications 2 and 3 of the Charge, when he actually merged specifications 1 and 2. Although we find no prejudice, Appellant is entitled to have court-martial records that correctly reflect the content of his proceeding.[47] In accordance with Rule for

---

[44] *Washington*, 57 M.J. at 399.

[45] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[46] Articles 59 & 66, UCMJ.

[47] *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998).

Courts-Martial 1111(c)(2), we modify the Entry of Judgment and direct that it be included in the record.

   The findings and sentence are **AFFIRMED**.

FOR THE COURT:

S. TAYLOR JOHNSTON
Interim Clerk of Court

# United States Navy–Marine Corps
# Court of Criminal Appeals

| | |
|---|---|
| **UNITED STATES** | NMCCA NO. 202100064 |
| **v.** | **ENTRY OF JUDGMENT** |
| **Justin M. GORTZIG** | |
| Aviation Electronics Technician Third Class (E-4) U.S. Navy | *As Modified on Appeal* |
| *Accused* | **31 August 2022** |

From 2 through 6 November 2020, the Accused was tried at Naval Air Station Jacksonville, Florida, by a general court-martial consisting of officer and enlisted members. Military Judges, Derek D. Butler (arraignment), John C. Johnson (motions), and Eric A. Catto (motions and trial), presided.

## FINDINGS

The following are the Accused's pleas and the Court's findings to all offenses the convening authority referred to trial:

**Charge:** Violation of Article 120b, Uniform Code of Military Justice, 10 U.S.C. § 920b.

*Plea:* Not Guilty.
*Finding:* Guilty.

**Specification 1:** Sexual abuse of a child on or about 28 October 2017.

*Plea:* Not Guilty.
*Finding:* Guilty

**Specification 2:** Sexual assault of a child on or about 28 October 2017.

*Plea:* Not Guilty.
*Finding:* Not guilty, but guilty of the lesser included offense of sexual abuse of a child.

**Specification 3:** **Sexual assault of a child on or about 29 October 2017.**

> *Plea:* Not Guilty.
>
> *Finding:* Not guilty, but guilty of the lesser included offense of sexual abuse of a child.

**Specification 4:** **Sexual abuse of a child on or about 29 October 2017.**

> *Plea:* Not Guilty.
>
> *Finding:* Guilty

## SENTENCE

On 6 November 2020, officer and enlisted members sentenced the Accused to the following (as modified, if at all, during any post-trial action):

**Reduction to pay grade E-1.**

**Forfeiture of $866.00 pay per month for 3 months.**

**A bad-conduct.**

Specifications 1 and 2 of the Charge were merged for sentencing as an unreasonable multiplication of charges.

The members awarded forfeitures of $866.55 pay per month for 3 months. Pursuant to R.C.M. 1003(b)(2), forfeitures shall consist of whole dollars, therefore the forfeitures to be entered is $866.00 pay per month for 3 months.

FOR THE COURT:

S. TAYLOR JOHNSTON
Interim Clerk of Court

2